No. 109,886

In the Matter of DANIEL R. BECK, *Respondent*.

(318 P.3d 977)

Opinion filed February 7, 2014.

*Kate F. Baird*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the brief for the petitioner.

*Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, argued the cause and was on the brief for respondent, and *Daniel R. Beck*, respondent, argued the cause pro se.

*Per Curiam*: This is a contested original proceeding in discipline filed by the office of the Disciplinary Administrator against respondent, Daniel R. Beck, of Andover, an attorney admitted to the practice of law in Kansas in 1988.

On January 5, 2012, the office of the Disciplinary Administrator filed a formal complaint against respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). On February 21, 2012, respondent filed an answer to the formal complaint. The Disciplinary Administrator filed a second formal complaint on November 14, 2012, which respondent answered on December 4, 2012. Respondent filed a proposed plan of probation on January 25, 2013.

The Kansas Board for Discipline of Attorneys conducted a hearing on the formal complaints on April 9, 2013, when the respondent was present and represented by counsel. Respondent stipulated he violated KRPC 1.4 (2013 Kan. Ct. R. Annot. 484) (communication with clients); KRPC 8.4(c) (2013 Kan. Ct. R. Annot. 655) (dishonest conduct); and KRPC 5.5 (2013 Kan. Ct. R. Annot. 630) (unauthorized practice of law). The panel accepted those stipulations and further determined respondent violated KRPC 1.1 (2013 Kan. Ct. R. Annot. 446) (competent representation); Kansas Supreme Court Rule 208 (2013 Kan. Ct. R. Annot. 349) (properly registered attorneys may practice law); and Kansas

Supreme Court Rule 218 (2013 Kan. Ct. R. Annot. 406) (giving notice following suspension).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

*"Findings of Fact*

. . . .

"DA11260

"15. In 1990, M.H. and L.H. established the M.F.H. Revocable Family Trust (hereinafter 'family trust'). M.H. and L.H. designated themselves as trustees. In the event of the death, resignation, or incapacity of M.H. and L.H., all rights and powers of the trustees were to vest in R.H., their only child.

"16. According to the family trust document, following the death of the surviving grantor, R.H. was to receive 100% of the assets of the trust. However, in the event R.H. predeceased the surviving grantor, the remainder of the trust property was to go to one of R.H.'s children, T.H., solely. Additionally, in the event R.H. did not desire to serve as trustee, B.D.N. was to be appointed as trustee.

"17. Following M.H.'s death in 1996, L.H. served as trustee of the trust until her resignation in 2008. Thereafter, R.H. assumed the duties as trustee of the family trust.

"18. In 2010, L.H. celebrated her 90th birthday. At that time, L.H. resided in nursing home in Hillsboro, Kansas.

"19. On February 10, 2010, the respondent met with R.H., his longstanding client, regarding R.H.'s estate planning matters. During that same meeting, the two discussed R.H.'s mother's estate planning matters. R.H. told the respondent that his mother, L.H., was not doing well. The respondent recommended that the family trust agreement entered by R.H.'s parents be updated to better protect the trust assets. L.H. was not present during the February 10, 2010, meeting. The respondent did not contact L.H. regarding revisions he proposed to be made to her trust document.

"20. After the February 10, 2010, meeting, for L.H., the respondent drafted a revised trust document, an updated general durable power of attorney, an updated living will, an updated last will and testament, an updated healthcare power of attorney, an updated assignment of personal property to R.H., and updated an authorization to release health care information.

"21. At the hearing on the formal complaint, the respondent testified that he recommended that the trust document be updated to better protect trust assets. The respondent stated that he updated the other six documents because in his experience, sometimes hospitals and financial institutions would not honor those documents if the documents are from some time ago. [Footnote: The respondent's testimony in this regard is unsubstantiated.]

"22. The respondent also testified, initially, that he made no substantive changes to the trust document. The respondent testified that he merely updated the trust document in an attempt to better protect the trust assets. However, upon further questioning, the respondent admitted that the revised trust document substantially changed the original family trust document by changing who would stand to receive the trust corpus in the event R.H. predeceased one of his parents. Who would stand to receive the trust corpus in the event R.H. predeceased one of his parents appears to have been a major consideration by M.H. and L.H. when the original family trust document was executed.

"23. The respondent did not meet with or talk to L.H. prior to drafting the estate planning documents.

"24. On February 19, 2010, respondent prepared a bill for $2,800.00 for preparing the family trust document and the other six documents.

"25. The respondent planned to meet R.H. at the nursing home on February 20, 2010. In preparation of a February 20, 2010, meeting, Kim Waugh, the respondent's secretary, packed the respondent's brief case with the original trust document, the other six documents, and Ms. Waugh's notary stamp.

"26. On Saturday, February 20, 2010, the respondent and his spouse drove to Hillsboro, Kansas, to meet with L.H. to discuss the revised trust documents and other six documents. Ms. Waugh planned to travel to Hillsboro, Kansas, with the respondent and the respondent's wife. However, because Ms. Waugh was feeling ill, she did not attend the meeting. At the hearing on the formal complaint, the respondent stated that he was not concerned about Ms. Waugh's absence because he planned to find a notary public at the nursing home.

"27. R.H. met the respondent and the respondent's wife at the nursing home on February 20, 2010. At the time the respondent arrived at the nursing home, L.H. was asleep. L.H. did not wake up at any time during the respondent's visit.

"28. The respondent did not discuss any of the documents with L.H. She did not review the documents or authorize their execution. The respondent did not determine if L.H. was competent or had the requisite capacity to sign the documents. L.H. did not sign any of the documents prepared by the respondent.

"29. The trust document that the respondent prepared contained the following execution section:

'I have executed this agreement on the day and the year first above written. This restated trust instrument is effective when signed by me, whether or not now signed by a Trustee.

'I certify that I have read this restated trust instrument, that I understand it, and that it correctly states the provisions under which my trust property is to be administered and distributed by my Trustee.

[L.H.], Grantor

[R.H.], Trustee

'The foregoing instrument was signed, declared and published by [L.H.] who indicated to us her present intention to authenticate said instrument, by her placing an (X) or her thumb print, in the presence of us and each of us, who, at their request and in their presence and in the presence of each other have hereunto subscribed our names as attesting witnesses at Marion, Kansas, on this 20th day of February, 2010.

Daniel R. Beck, Witness

Carol D. Beck, Witness

'STATE OF KANSAS, MARION COUNTY, ss:

'BEFORE ME, the undersigned authority, on this day personally appeared [L.H.], Daniel R. Beck, and Carol D. Beck known to me to be the Grantor, and the witnesses, respectively, whose names are subscribed to the annexed or foregoing instrument in their respective capacities, and, all of said persons being by me first duly sworn, said [L.H.], Testator, declared to me and to the said witnesses in my presence that said instrument in her instrument, and that she has willingly made and executed it as her free and voluntary act and deed for the purposes therein expressed; and the said witnesses, each on her oath stated to me, in the presence and hearing of the said [L.H.], that said [L.H.] has declared to them that she executed the above instrument as stated above and requested each of them to sign it as a witness; and upon their oaths each witness stated further that they did sign the same as witnesses in the presence of each other and in the presence of [L.H.] at that time possessed the rights of majority, were of sound mind and under no restraint.

'SUBSCRIBED, acknowledged and sworn to before me by [L.H.] and the above witnesses this 20th day of February, 2010.

Kim D. Waugh, Notary Public

'My appointment expires:
'November 4, 2012'

Each of the other six documents contain similar execution sections.

"30. Because L.H. was not awake, the respondent instructed R.H. to sign L.H.'s name to the family trust document. Additionally, the respondent instructed R.H. to sign his mother's name to each of the other six documents prepared on behalf of L.H. Without his mother's knowledge or authorization, R.H. signed his mother's name to the trust document and each of the other six documents drafted by the respondent.

"31. The respondent and his wife signed as witnesses to the trust document and each of the other six documents. Additionally, the respondent signed Ms. Waugh's name and used Ms. Waugh's notary seal, making it appear that Ms. Waugh attested to having witnessed L.H.'s execution of the trust agreement, as well as all the other six documents. By signing Ms. Waugh's name and using Ms.

Waugh's notary stamp, the respondent falsely attested that the instruments were signed by L.H. who, in the presence of the notary, declared her intent to authenticate the trust agreement.

"32. The respondent did not inform Ms. Waugh that he had used her notary stamp and signed her name.

"33. On March 5, 2010, R.H., as trustee of the family trust, paid the respondent's bill of $2,800.00, for drafting the restated trust agreement and other documents.

"34. On June 24, 2010, the respondent wrote to R.H. Apparently, the respondent made additional changes to L.H.'s trust document and other documents. The respondent apologized to R.H. for failing to forward L.H.'s corrected documents to R.H.

"35. L.H. died on July 24, 2010. At no time prior to L.H.'s death, did the respondent advise L.H. that her trust document and other documents had been revised or that R.H. signed L.H.'s name to the revised trust document and other six documents.

"36. After his mother's death, R.H. retained Robert Brookens, an attorney in Marion, Kansas, to assist him selling real estate owned by the family trust. During their meeting, R.H. explained the circumstances surrounding the execution of the revised trust document in February, 2010.

"37. Mr. Brookens believed that he had knowledge of actions which, in his opinion, constituted misconduct of the respondent. Thus, based on KRPC 8.3(a), Mr. Brookens filed a complaint against the respondent.

"DA11553

"38. In 2006, the respondent failed to satisfy the annual requirements to maintain his law license by failing to provide adequate documentation of continuing legal education hours. As a result, on October 11, 2006, the Kansas Supreme Court suspended the respondent from the practice of law.

"39. The respondent received the Court's order of suspension. The respondent understood that his license to practice law was suspended. Following the suspension of his license, the respondent failed to notify clients, opposing counsel, and courts, as required by Kan. Sup. Ct. R. 218.

"40. On November 6, 2006, the respondent called the Kansas CLE Commission to find out what steps he needed to take to have his license reinstated. The respondent failed to take the required steps to have his license reinstated.

"41. On August 8, 2007, the respondent again called the Kansas CLE Commission to find out what he needed to do to have his license reinstated. Again, the respondent failed to take the required steps to have his license reinstated.

"42. In November, 2009, the respondent finally provided the Kansas CLE Commission with the necessary information to satisfy the annual registration requirements. Thereafter, the respondent filed a motion for reinstatement. On November 23, 2009, the Court issued an order reinstating the respondent's license to practice law.

"43. Despite the Court's order of suspension, the respondent engaged in the active practice of law throughout the period of suspension.

*"Conclusions of Law*

"44. Based upon the findings of fact, the hearing panel concludes as a matter of law that in DA11260 the respondent violated KRPC 1.1, KRPC 1.4, and KRPC 8.4(c), and in DA11553 the respondent violated KRPC 5.5, Kan. Sup. Ct. R. 208, and Kan. Sup. Ct. R. 218, as detailed below.

"KRPC 1.1

"45. Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' The thoroughness and preparation necessary for competent representation requires an attorney to discuss the matter of the representation with the client. The respondent failed to provide competent representation by failing to discuss the representation with L.H. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.1.

"KRPC 1.4

"46. KRPC 1.4(a) provides that '[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.' The respondent stipulated that he violated KRPC 1.4 by failing to communicate with L.H. Thus, the hearing panel concludes that the respondent violated KRPC 1.4(a).

"KRPC 5.5

"47. KRPC 5.5(a) prohibits the unauthorized practice of law. The respondent stipulated that he violated KRPC 5.5(a) by continuing to practice law after the Kansas Supreme Court suspended the respondent's license to practice law. The respondent engaged in the active and continuous practice of law throughout the three years that his license was suspended. Accordingly, the hearing panel concludes that the respondent violated KRPC 5.5(a).

"KRPC 8.4(c)

"48. 'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent stipulated that he engaged in conduct that involved dishonesty when he forged his secretary's name and when he directed his client, R.H., to sign his mother's name to the trust document and other documents, including a last will and testament. As such, the hearing panel concludes that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation and therefore violated KRPC 8.4(c).

"Kan. Sup. Ct. R. 208

"49. In order to practice law, an attorney must comply with the annual reg-

istration requirements, including completing the annual registration form, paying the annual registration fee, and complying with the annual continuing legal education obligations. The respondent failed to comply with the annual continuing legal education obligations and, as a result, the respondent's license was suspended and the respondent was not registered as an active attorney from 2006 to 2009. Accordingly to Kan. Sup. Ct. R. 208, '[o]nly attorneys registered as active may practice law in Kansas.' The hearing panel concludes that the respondent violated Kan. Sup. Ct. R. 208 when he practiced law while his license to do so was suspended.

"Kan. Sup. Ct. R. 218

"50. After an attorney's license is suspended, the respondent must comply with Kan. Sup. Ct. R. 218. Kan. Sup. Ct. R. 218 requires a suspended attorney to notify clients, opposing counsel, and the courts of the suspension. Following the respondent's suspension in 2006, the respondent failed to notify his clients, opposing counsel, and the courts of his suspension. Thus, the hearing panel concludes that the respondent violated Kan. Sup. Ct. R. 218.

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"51. In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"52. *Duty Violated.* The respondent violated his duty to his client to provide adequate communication and competent representation. Additionally, the respondent violated his duty to the legal profession to maintain his personal integrity. Finally, the respondent violated his duty to the legal system to comply with court rules.

"53. *Mental State.* The respondent knowingly and intentionally violated his duties.

"54. *Injury.* As a result of the respondent's misconduct, the respondent caused serious potential injury to L.H. and her heirs, actual injury to the legal profession, and serious potential injury to the legal system.

"Aggravating and Mitigating Factors

"55. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"56. *Prior Disciplinary Offenses.* The respondent has been previously disciplined on one occasion. In 1995, the disciplinary administrator informally admonished the respondent for having violated KRPC 1.3.

"57. *Dishonest or Selfish Motive.* The respondent engaged in dishonest and selfish conduct when he directed R.H. to sign his mother's name and when the respondent signed his secretary's name as a notary public. Neither L.H. nor R.H. received a benefit as a result of the respondent's conduct in this case. The only benefit realized by anyone in this transaction was the $2,800.00 attorney fee the respondent received for drafting the trust document and other documents. Thus, the motivation in this case appears to be the attorney fee generated by the respondent's conduct. As such, the hearing panel concludes that the respondent engaged in conduct that was motivated by dishonesty and selfishness.

"58. *Multiple Offenses.* The respondent committed multiple rule violations. The respondent violated KRPC 1.1, KRPC 1.4, KRPC 5.5, KRPC 8.4(c), Kan. Sup. Ct. R. 208, and Kan. Sup. Ct. R. 218. The hearing panel concludes that the respondent committed multiple offenses.

"59. *Vulnerability of Victim.* L.H., a 90-year-old nursing home resident, was vulnerable to the respondent's misconduct. L.H. never knew that the respondent drafted a trust document and other documents for her or that her trust paid the respondent $2,800 in attorney fees. The hearing panel concludes that L.H. was vulnerable to the respondent's misconduct.

"60. *Substantial Experience in the Practice of Law.* The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1988. At the time of the misconduct, the respondent had been practicing law for more than 20 years.

"61. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"62. *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.* According to Dr. Quillen, a licensed clinical psychologist, the respondent has previously suffered from major depression but the respondent's depression is currently in full remission. Dr. Quillen's report indicates that his previous depression contributed to his misconduct associated with practicing law while his license was suspended. Conversely, however, Dr. Quillen's report indicates that the respondent's previous depression did not occur at the same time as misconduct associated with his representation of L.H. and, as a result, 'is not based in the underlying depression.'

"63. *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations. Finally, the respondent admitted that he violated KRPC 1.4, KRPC 5.5, KRPC 8.4(c), and Kan. Sup. Ct. R. 208.

"64. *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.* The respondent is an active and productive

member of the bar of Andover, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"65.  *Remorse.* At the hearing on this matter, the respondent presented some evidence of remorse for having engaged in the misconduct.

"66.  *Remoteness of Prior Offenses.* The discipline imposed in 1995 is remote in character and in time to the misconduct in this case.

"67.  In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'5.11  Disbarment is generally appropriate when:

(a)  a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses;

(b)  a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

. . . .

'7.1  Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

'7.2  Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

*"Recommendation*

"68.  The deputy disciplinary administrator recommended that no less than indefinite suspension be imposed. The respondent argued that the hearing panel should recommend that the Supreme Court censure the respondent and place the respondent on probation for one or two years, subject to the terms and conditions of his plan of probation.

"69.  Probation is appropriate in limited circumstances. Kan. Sup. Ct. R. 211(g)(3) provides that the hearing panel shall not recommend that the respondent be placed on probation unless:

'(i)  the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

'(ii) the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

'(iii) the misconduct can be corrected by probation; and

'(iv) placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

"70. Probation is not appropriate in this case for several reasons. First, there is nothing in the respondent's plan that will work to prevent the respondent from repeating the misconduct in this case.

"71. Second, the respondent's misconduct in DA11260, dishonest conduct, cannot be corrected by probation. See *In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.'), and *In re Baker*, 296 Kan. 696, 709, 294 P.3d 326 (2013) ('Generally, this court has been wary of granting probation where the underlying misconduct involves dishonesty. No level of supervision can assure public safety from misrepresentation or fraud.').

"72. Finally, placing the respondent on probation is not in the best interest of the legal profession and the citizens of the State of Kansas. Thus, probation is not appropriate in this case.

"73. The misconduct in this case is serious. The respondent engaged in dishonest conduct—he forged his secretary's name in the notary block and directed his client to commit a potential criminal offense by signing his mother's name to a trust document and six other documents includ[ing] a last will and testament. Furthermore, the respondent practiced law for a period of three years while his license was suspended.

"74. The ABA Standards indicate that either suspension or disbarment is appropriate given the respondent's misconduct in this case. The hearing panel is persuaded by the evidence in mitigation and concludes that disbarment is not warranted. However, because the respondent engaged in dishonest conduct, the respondent's license must be suspended.

"75. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent's license be suspended for a period of two years.

"76. Costs are assessed against the respondent in an amount to be certified by the office of the disciplinary administrator."

## DISCUSSION

Respondent filed exceptions to the panel's final hearing report on June 7, 2013, challenging several of the panel's legal and factual conclusions, its assessment of aggravating and mitigating circumstances, and its recommended punishment. See Supreme Court Rule 212(d) (2013 Kan. Ct. R. Annot. 375) (providing respondent

must file exceptions to final hearing report to avoid having findings deemed admitted). But respondent's brief to this court does not challenge any of the panel's conclusions regarding respondent's violation of six disciplinary rules. See *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008) (determining exceptions not briefed are deemed waived or abandoned).

Accordingly, the panel's factual findings are deemed admitted, and we find clear and convincing evidence supports the panel's determinations. Nevertheless, because of the gravity of respondent's violations, we will summarize them again here before considering the appropriate discipline.

The panel first found clear and convincing evidence that respondent violated KRPC 1.1, which requires that an attorney provide competent representation. Competent representation requires, at a minimum, that an attorney discuss and communicate with the client regarding the matter of the representation.

Here, the respondent wholly failed in this regard in that he *never* communicated with L.H. regarding the "matter" of representation. In fact, L.H. never requested respondent's services in the first instance, and respondent never spoke with L.H. about whether she desired any services, much less the nature of the services she might desire. And after respondent prepared seven different end-of-life documents on L.H.'s behalf and without her knowledge, he never explained the documents to L.H. or reviewed them with her. In fact, respondent never even attempted to insure that L.H. was capable or competent to execute the documents he prepared for her. Instead, respondent directed L.H.'s son to forge L.H.'s signature on the documents. Respondent then falsely witnessed the forged documents and directed his wife to do the same before forging his secretary's notary signature to each document, falsely verifying that his secretary had witnessed L.H.'s signing of the document. Finally, respondent's failure to communicate with L.H. was made more egregious by his continuing failure to communicate with L.H. in the 5 months following the falsification of the documents but preceding her death in July 2010.

Respondent's multiple communication failures also violated KRPC 1.4, which requires that an attorney keep a client reasonably

informed about the status of a matter and promptly comply with reasonable requests for information.

Further, respondent's conduct associated with the execution of the documents he ostensibly prepared for L.H. violated KRPC 8.4(c), which prohibits dishonest conduct. Respondent engaged in significant dishonest conduct by directing R.H. to forge his mother's signature on all seven documents, by falsely attesting himself to having witnessed L.H.'s signature on all seven documents, by directing his wife to falsely attest to having witnessed L.H.'s signatures, and by forging his secretary's name as notary on all seven documents, falsely verifying that his secretary had witnessed and notarized each of L.H.'s signatures.

Additionally, respondent failed to document his CLE hours, resulting in a suspension of his license, and then greatly compounded that initial failure by practicing law for a full 3 years without a license in violation of KRPC 5.5 (2013 Kan. Ct. R. Annot. 630) and Supreme Court Rule 208 (2013 Kan. Ct. R. Annot. 349), and by failing to notify clients of his suspension in violation of Supreme Court Rule 218. Respondent proffered at oral argument that he "did not have a real appreciation" for what was meant by "administrative suspension." But the record belies this assertion as the order respondent received from this court unquestionably suspended respondent's license. Further, the record demonstrates that after his license was suspended, respondent contacted the CLE office on two different occasions about a year apart to determine necessary requirements for reinstatement but then failed to take any action to reinstate his license. Respondent's failure to abide by his suspension violated KRPC 5.5 and Supreme Court Rule 208. Further, respondent's failure to notify his clients of his suspension violated Supreme Court Rule 218 (2013 Kan. Ct. R. Annot. 406).

*Aggravating and Mitigating Circumstances*

Keeping in mind respondent's multiple admitted violations of the KRPC, we proceed to consider the appropriate punishment. The Disciplinary Administrator suggests respondent should receive nothing less than an indefinite suspension, while respondent urges

us to impose published censure and probation. The panel recommended a 2-year suspension. See Supreme Court Rule 212(f) (providing panel's recommendation is advisory).

In issuing a sanction for misconduct, we consider the facts and circumstances of the violations as well as the relevant aggravating and mitigating circumstances. *In re Johanning*, 292 Kan. 477, 490, 254 P.3d 545 (2011). Respondent's brief takes issue with several of the aggravating circumstances found by the panel and with what he perceives as a minimization of one mitigating factor.

The panel concluded respondent acted with a dishonest or selfish motive because "[t]he only benefit realized by anyone in this transaction was the $2,800.00 attorney fee the respondent received." Respondent disputes that he acted with a dishonest motive and asserts the panel based its finding on the Disciplinary Administrator's improper use of a document to refresh respondent's recollection when that document had not been disclosed to respondent. While the record is unclear whether the Disciplinary Administrator should have disclosed the document under Supreme Court Rule 216(d) (2013 Kan. Ct. R. Annot. 393) or whether the panel even relied upon that document in concluding respondent acted with a dishonest motive, in the interest of fairness we will not rely on the panel's finding that respondent acted with a dishonest motive.

Respondent also argues the panel erred in finding that the vulnerability of the victim, L.H., was an aggravating factor. Respondent admits L.H. was vulnerable but asserts that we must construe the word "victim" to require a showing that the attorney's conduct *"actually expose[d]* [a] vulnerable client[] to real and significant harm," and argues such a showing was not made in this case.

We need not decide whether the term "vulnerable victim" requires that an attorney expose a client to actual harm because we conclude the record contains adequate evidence of injury, including the $2,800 L.H.'s trust paid to respondent for legal work L.H. never authorized, approved, or used.

Further, we reject respondent's suggestion that L.H. was not injured, and thus not a "victim," because the multiple documents respondent prepared without her request, knowledge, or approval,

essentially paralleled the contents of documents L.H. executed a decade or more before. Even a cursory review of the documents respondent prepared reveals that they do not "parallel" the prior documents in several respects. For instance, the living will respondent drafted required that only one physician determine whether L.H. was in a terminal or vegetative condition before withholding life-prolonging procedures instead of two physicians, as required by L.H.'s previous living will.

Moreover, since respondent never spoke to L.H., he can only speculate as to whether the documents he drafted would comport with L.H.'s current wishes. Put simply, an attorney injures, or at least potentially injures, a client when he or she takes legal action on the client's behalf without ever speaking with the client or ensuring that the proposed action is in accord with the client's wishes.

Finally, after noting that respondent presented "some evidence" of remorse at his hearing, the panel found that respondent's remorse mitigated his punishment. Despite the panel's finding of this mitigating factor, respondent now takes issue with the panel's characterization of the evidence he presented. Respondent suggests he was "completely contrite and remorseful" and thus did more than present "some evidence" of remorse. But the panel was in a better position to assess the genuineness and depth of respondent's remorse, and based on the record before us, we see no reason to disturb the panel's assessment. See *In re Collins*, 295 Kan. 1084, 1093, 288 P.3d 847 (2012) (noting that court does not assess credibility).

*Discipline*

The panel rejected respondent's suggestion that he receive probation after concluding both that respondent's conduct could not be corrected by a probationary period and that probation was not in the best interests of the legal profession or the citizens of Kansas. Based on the ABA Standards for Imposing Lawyer Sanctions, the panel determined respondent's conduct warranted either disbarment or a suspension and ultimately recommended a 2-year suspension based on mitigating evidence. Given the severity of respondent's misconduct and the aggravating circumstances, we also

conclude that probation is not appropriate, but we do not agree that a 2-year suspension is a sufficient sanction.

Initially, we question the appropriateness of a suspension when respondent practiced law for 3 years with a suspended license. Although, respondent presented evidence that this misconduct was due in part to depression, even at oral argument respondent appeared not to understand the gravity of his conduct in practicing law without a license and failing to notify his clients of his suspension.

Further, respondent's conduct in connection with the L.H. matter causes us great concern. Respondent drafted seven separate legal documents without ever speaking to his client, including documents reflecting end-of-life decisions such as whether and when to have life-sustaining medical care removed and the manner in which L.H.'s estate would be held in trust and distributed. We can only speculate whether these documents reflected L.H.'s actual wishes.

Finally, respondent engaged in dishonest conduct by falsely attesting to L.H.'s signature seven times and seven times forging his secretary's name and using her notary stamp to make it appear the document was properly notarized. He also asked others, including his wife and L.H.'s son, to engage in similar wrongful conduct, disregarding the possibility that such actions could lead to criminal sanctions and threaten the effectiveness of the documents.

We conclude respondent's grave misconduct violated some of the most basic tenets of our profession and merits his disbarment.

## CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Daniel R. Beck be disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2013 Kan. Ct. R. Annot. 300).

IT IS FURTHER ORDERED that the respondent shall comply with Supreme Court Rule 218 and Supreme Court Rule 219 (2013 Kan. Ct. R. Annot. 407).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.